# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                        )
LUANNE MORAN,                           )
                                        )
                Plaintiff,              )
                                        )
        v.                              )        Civil Action No. 09-1819 (ABJ)
                                        )
UNITED STATES CAPITOL                   )
POLICE BOARD,                           )
                                        )
                Defendant.              )
_____)

## MEMORANDUM OPINION

Plaintiff Luanne Lynn Moran brings this action against the United States Capitol Police Board ("USCP") under the Congressional Accountability Act of 1995, 2 U.S.C. § 1301, *et seq.* ("CAA").  In an earlier Order, this Court granted the USCP's motion to dismiss Counts I, II, IV, V, and VI of the first amended complaint, *see* Order [Dkt. # 29], leaving only Count III.  The remaining count alleges that the USCP retaliated against Moran for engaging in protected activity in violation of section 1317(a) of the CAA.  After the close of discovery, the USCP moved for summary judgment on the remaining count.  [Dkt. # 34].  Because the Court

concludes that plaintiff has not proffered sufficient evidence from which a reasonable jury could infer retaliation, it will grant defendant's motion.[1]

## I.    BACKGROUND

The following facts are uncontested, except where noted.  Moran's employment with the United States Capitol Police began on October 3, 1995.  Dep. of Luanne Moran ("Moran Dep."), Ex. 1 to Def.'s Mot. for Summ. J. [Dkt. # 34-6] ("Def.'s Mot.") at 12.  In September 1998, she was transferred to the Dignitary Protection Division ("DPD"), which is the unit responsible for protecting congressional leadership.  Decl. of Luanne Moran ("Moran Decl."), Ex. 1 to Pl.'s Opp. to Def.'s Mot. [Dkt. # 35-1] ("Pl.'s Opp.") ¶ 1.  In January 2005, Moran filed a complaint with the Office of Compliance ("OOC") alleging that the USCP engaged in discrimination on the basis of sex in assigning officers to the detail of the Speaker of the House Nancy Pelosi ("Speaker").  *Id.* ¶ 2.  Eventually, the complaint was settled and Moran was assigned to the Speaker's detail.  *Id.* ¶ 3.

### A.  Disciplinary actions against Moran

On September 4, 2008, Supervisor Special Agent ("SSA") Raymond Stonestreet – one of Moran's supervisors – began an investigation into four incidents of alleged misconduct by

---

1       Before issuing this opinion, the Court solicited from counsel for both parties objections to the use of any information that appears in sealed pleadings.  Defendant's counsel responded to the Court's notice with several objections.  In light of that response, the Court has reviewed the opinion to ensure that it does not contain any of the information of concern to defendant. Plaintiff's counsel of record, however, did not respond to the Court's call for objections. Plaintiff's counsel also failed to respond to a second notice issued by the Court, explaining that in the event that he failed to raise any objections by 5:00pm on this day, the Court would issue the opinion on the public docket.  Accordingly, this opinion will not be placed under seal.  The Court notes that none of the pleadings or exhibits filed by plaintiff were filed under seal.  [Dkt. # 35].

Moran.[2]  *See* USCP Report of Investigation, Att. 1 to Ex. 5 to Def.'s Mot. ("Investigation Rep."),

at 3.  According to the report of the investigation and the command discipline report, the four

incidents are as follows:

1. On July 18, 2008,[3] while driving in the Speaker's motorcade, Moran allegedly had an
   unwarranted confrontation with Detective ("Det.") Tim Atkinson of the Austin Police
   Department in which she criticized the way he handled an assignment with the USCP.
   Investigation Rep. at 11–13; Ex. 9 to Investigation Rep.  For example, she told him
   "that [he] could have killed a person when [he] pulled into the arrival area because
   [he] did not operate slowly."  Ex. 9 to Investigation Rep.  This conduct allegedly
   brought discredit upon herself, impaired efficiency, and discredited the reputation of
   the department.  Investigation Rep. at 13.

2. On the same day, Moran allegedly second-guessed another agent (SA Sean
   MacDougal) in the presence of the Speaker regarding the drive time to an
   appointment the next morning.  Command Discipline Report, Ex. 4 to Def.'s Mot.
   ("Command Discipline Rep.") at 3.  This allegedly embarrassed SA MacDougal and
   reflected unfavorably on him.  *Id.*

3. On August 4, 2008, upon arrival of the Speaker and her detail at the Speaker's hotel
   in Boston, Moran stepped out of formation.  Ex. 16 to Investigation Rep. at 1.  This
   caused the Speaker to follow Moran through a different entrance than the one that had

---

2    A fifth alleged incident of misconduct also contributed to the initiation of the
investigation.  Plaintiff received a separate penalty for that incidence of misconduct, and that
penalty is not included in the claim of retaliation that is at issue here.  Pl.'s Opp. at 6–7.

3    Some documents report that these events occurred on July 18, *see* Moran Dep. at 128,
while others report the date as July 19, *see* Command Discipline Report, Ex. 4 to Def.'s Mot. at
3.  Because this is not a material fact, the Court will refer to the date of these incidents as July
18.

been prepared for her arrival. *Id.* This incident allegedly "eroded the confidence the Speaker has with the protective operation and at the same time jeopardized the safety of the Speaker."[4] Command Discipline Rep. at 3. SSA Stonestreet discussed this incident with Moran on August 14, 2008.[5] Ex. 16 to Investigation Rep.

4. On August 10, 2008, Moran again questioned SA MacDougall's assessment of motorcade routes and travel times in the presence of the Speaker. Command Discipline Rep. at 3. This allegedly confused the Speaker and embarrassed SA MacDougall. Ex. 16 to Investigation Rep. at 1–2.

Several written statements and declarations, attached to the report of investigation, supported these findings. Ex. 3, 6–7, 9, 16–18 to Investigation Rep. Defendant has also submitted declarations and transcripts of depositions of USCP employees who allegedly witnessed these events. Ex. 6–7 to Def.'s Mot. On August 14, 2008, SSA Stonestreet first approached Moran to talk about the third and fourth events. Moran Decl. ¶ 6. He subsequently left town for a protective assignment. and upon his return on September 4, 2008, he began a formal investigation. Investigation Rep. at 3.

On November 18, 2008, after the investigation into these incidents concluded, SSA Stonestreet wrote a CP-534 and forwarded it through Moran's chain of command, according to USCP policy. Command Discipline Rep; *see* USCP Operational Directive, Ex. 2 to Def.'s Mot.

---

[4]    The Speaker's chief counsel submitted a letter to Moran's attorney regarding this incident, stating that "[t]he language used in the CP-534 issued to Plaintiff Special Agent Luanne Moran on December 9, 2008 for a violation of Conduct Unbecoming, which states 'SA Moran's actions eroded the confidence the Speaker has with the protective operation' was not based on any communication from Speaker Pelosi or her staff." Ex. 10 to Pl.'s Opp.

[5]    Some documents cite the date of this meeting as August 14, *see* Moran Decl., Ex. 1 to Pl.'s Opp. ¶ 6, and some cite it as August 16, *see* Ex. 16 to Investigation Rep. The date is not a material fact, so the Court will refer to the date as August 14.

4

("USCP Operational Directive I").  A CP-534 is the form used to record command discipline. USCP Operational Directive I at 2.  Command discipline is the method that the USCP uses for documenting and adjudicating minor infractions that have not been, or may not be corrected through, training and/or counseling and may result in a loss of time or pay up to and including twenty-four hours.  *Id.*  The CP-534 charged Moran with "Conduct Unbecoming" and stated that Moran's "conduct during these incidents brings discredit upon herself, impairs efficiency, and discredits the reputation of the US Capitol Police."  Command Discipline Rep. at 1, 3.

Lt. John Erickson, the section commander, signed off on SSA Stonestreet's report on November 24, 2008.  Command Discipline Rep. at 2.  On the same day, Captain George Hawco reviewed the charge and recommended a forfeiture of sixteen hours of pay, explaining, "SA Moran's conduct is very disturbing. . . . Such misconduct can impact [] protectee confidence in DPD, is counter to DPD training and operations, affects operational relationships with outside law enforcement agencies that support DPD, and most significantly – can adversely impact DPD's core mission of protecting the Congressional Leadership."  *Id.*

Moran filed an internal appeal, alleging that the report mischaracterized the incidents described in the CP-534.  Memorandum of Appeal, Ex. 3 to Def.'s Mot. ("Mem. of Appeal"). As to the first incident, Moran claimed that she and Detective Atkinson had a "conversation (not an altercation)."  *Id.* at 3.  As to the third incident, she claimed "Sgt. Stonestreet said nothing to the Speaker to point her in the right direction" even though he knew that the speaker should have entered through a different door than the one she used.  *Id.*  And as to the second and fourth incidents, she claimed that she did not embarrass SA MacDougall regarding the morning departure times.  *Id*.

Chief Morse denied the appeal.   Command Discipline Rep. at 2.   Defendants have submitted a declaration by Chief Morse that explains in detail why he credited the facts in the investigation.   Morse Decl., Ex. 14 to Def.'s Mot.   With respect to the first incident, he explained that "there was no question that an incident occurred between Detective Atkinson and SA Moran."   *Id.* ¶ 8.   With regard to the second incident, he explained that "SA Moran admitted in her appeal to questioning and countermanding SA MacDougall in front of the protectee" and "[a]lthough SA Moran stated she had no idea how this event embarrassed SA MacDougall, she did not provide facts in her appeal to demonstrate that she did not embarrass him."   *Id.* ¶¶ 15–16. With regard to the third incident, he found that SA Moran was not in proper formation and that "there was no dispute that the protectee followed SA Moran" which resulted in her entering through a less secure door.   *Id.* ¶¶ 10–13.   Finally, with regard to the fourth incident, he noted that "there was a dispute between SA Moran and two other agents present (SSA Stonestreet and SA MacDougall) as to whether she had questioned SA MacDougall in front of the protectee again."   *Id.* ¶ 17.   But he found that "SA Moran inappropriately contradicted SA MacDougall in front of the protectee when she did not have all the facts" and that in her role, "SA Moran should have known the answer to the protectee's question about travel times and should have answered it.   Instead she looked to SA MacDougal to answer the question."   *Id.* ¶¶ 17–19.

## B.  Moran's complaints

Moran claims that the issuance of the CP-534 and the investigation leading up to it were actually conducted in reprisal for three complaints she had filed:  the 2005 complaint to the OOC regarding sex discrimination in appointing officers to the Speaker's detail, as well as two complaints that she filed in 2008 with the Office of Professional Responsibility ("OPR"), the USCP's internal affairs office.   Am. Compl. ¶¶ 117–26.   Specifically, Moran filed the first

complaint with OPR on August 5, 2008 after verbally complaining to Lt. John Erickson about a supervisor.  Moran Decl. ¶ 4.  The complaint identified four occasions when that supervisor made sexually-charged comments to and about female USCP employees, and also alleged that the supervisor did nothing when another agent complained about racial comments.  Compl. Rep. (Aug. 5, 2008), Ex. 11 to Def.'s Mot. at 2.  None of the alleged comments were directed to or about Moran, or were witnessed first-hand by Moran.  *Id.*  Moran's second complaint to OPR was filed on November 7, 2008.  Compl. Rep. (Nov. 6, 2008), Ex. 12 to Def.'s Mot.  It claimed that SSA Stonestreet, the supervisor that she had complained about, and a third agent were retaliating against her for filing the August 5 complaint.  *Id.* at 2.  Moran later rescinded this complaint.[6]  *Id.* at 3.

### C.  This Action

Moran filed the first amended complaint in this action on January 15, 2010.  [Dkt. # 2].  The Court granted defendant's motion to dismiss five of the six counts.  [Dkt. # 29].  The remaining count, Count III, alleges that the CP-534 and resulting forfeiture of sixteen hours of pay, was issued in retaliation for three complaints, which she claims are protected activities under the CAA.  Am. Compl. ¶¶ 117–126.  Defendant has moved for summary judgment on this count.  [Dkt. # 34].

### II.   STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

---

6       Although Moran's rescission letter explains that she planned to pursue this claim through the OOC, Compl. Rep. (Nov. 6, 2008) at 3, there is nothing in the record to suggest that she ever filed a formal complaint.  Rather, the record reflects that Moran pursued mediation relating to this claim, *see* Exs. 8–9 to Def.'s Mot., and then pursued the instant action in this Court.  *See* Pl.'s Opp. at 6–7.

56(a).  The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  To defeat summary judgment, the non-moving party must "designate specific facts showing there is a genuine issue for trial."  *Id.* at 324 (internal quotation marks omitted).  The existence of a factual dispute is insufficient to preclude summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is only "material" if it is capable of affecting the outcome of the litigation.  *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).

In assessing a party's motion, "[a]ll underlying facts and inferences are analyzed in the light most favorable to the non-moving party."  *N.S. ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d 57, 65 (D.D.C. 2010), citing *Anderson*, 477 U.S. at 247.  The non-movant may not, however, rest upon the mere allegations or denials in its pleadings, but must instead establish more than "the mere existence of a scintilla of evidence" in support of its position.  *Anderson*, 477 U.S. at 252.  The court will "not accept bare conclusory allegations as fact."  *Taylor v. F.D.I.C.*, 132 F.3d 753, 763 (D.C. Cir. 1997); *see also District Intown Props Ltd. P'ship v. District of Columbia*, 198 F.3d 874, 878 (D.C. Cir. 1999) ("[T]he court must assume the truth of all statements proffered by the non-movant except for conclusory statements lacking any factual basis in the record.").

### III.    ANALYSIS

Under the CAA, it is unlawful for the USCP "to intimidate, take reprisal against, or otherwise discriminate against, any covered employee" because she "has opposed any practice made unlawful by this chapter, or because the employee has initiated proceedings, made a charge, or testified, assisted, or participated in any manner in a hearing or other proceedings under this chapter."   2 U.S.C. § 1317(a).   These are, respectively, the "opposition" and "participation" clauses.  Although the CAA contains its own retaliation provision, courts refer to the body of case law regarding discrimination under Title VII to evaluate claims of retaliation under the CAA.[7] *Herbert v. Architect of Capitol*, 766 F. Supp. 2d 59, 74 n.13 (D.D.C. 2011); *see also* 2 U.S.C. §§ 1302(a)(2), 1311(a)(1) (the CAA extends the protections of Title VII to the legislative branch).  Accordingly, courts in this circuit apply the *McDonnell Douglas* framework. *Herbert*, 766 F. Supp. 2d at 74 n.14; *see Forman v. Small*, 271 F.3d 285, 299 (D.C. Cir. 2001) (explaining the *McDonnell Douglas* framework).

Under the *McDonnell Douglas* framework, plaintiffs first bear the burden of making a *prima facie* showing of retaliation.  *Id.*  Once that showing has been made, the burden shifts to the defendant to produce a "legitimate, nondiscriminatory reason" for its actions.  *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009) (internal quotation marks and citations omitted). If the employer makes this showing, then "the burden-shifting framework disappears," *Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004), and the question before the court is "whether a reasonable jury could infer . . . retaliation from all the evidence."  *Id.*

In order to make a *prima facie* showing of retaliation, plaintiff must show that (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there is a

---

7      In discussing the legal framework, the Court refers to the CAA and Title VII interchangeably.

causal connection between the protected activity and the adverse action.  *Jones*, 557 F.3d at 677 (internal citations omitted); *Taylor v. Solis*, 571 F.3d 1313, 1320 n.* (D.C. Cir. 2009).

At the summary judgment stage, however, if the employer produces a legitimate nondiscriminatory reason for its actions, "'the district court need not – *and should not* – decide whether the plaintiff actually made out a *prima facie* case under *McDonnell Douglas*.'"  *Jones*, 557 F.3d at 677, quoting *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008).  The central question becomes whether the plaintiff produced evidence sufficient for a reasonable jury to find that the employer's stated reason was not the actual reason for the adverse action and that the employer actually retaliated against the plaintiff.  *Brady*, 520 F.3d at 495.  In assessing this question, the court considers "all the evidence, which includes not only the *prima facie* case but also the evidence the plaintiff offers to attack the employer's proffered explanation for its action and other evidence of retaliation."  *Jones*, 557 F.3d at 677 (internal quotation marks and citations omitted)

### A.  Legitimate, non-retaliatory reason for the adverse employment action

Since this count reaches the Court at the summary judgment stage, the Court will first assess the reason that the USCP offers for issuing the CP-534.  The Court first finds that the USCP has stated a legitimate, non-retaliatory reason for issuing Moran the CP-534, and docking sixteen hours of her pay.  The USCP points to four instances when Moran "brought discredit to the U.S. Capitol Police, specifically the Speakers Protection Detail."  Command Discipline Rep. at 3.

- On July 18, 2008, Moran initiated an unwarranted altercation with Austin Police Det. Atkinson concerning Det. Atkinson's speed while driving in the Speaker's motorcade. *Id.*

10

- Also on July 18, 2008, Moran embarrassed SA MacDougall by questioning his estimated travel time for the Speaker's first event the following morning in front of the Speaker. *Id.*

- On August 4, 2008, Moran broke the protection formation, which led the Speaker to enter a building through the wrong door and "jeopardized the safety of the Speaker." *Id.*

- On August 10, 2008, Moran again embarrassed SA MacDougall by questioning the estimated travel time for the following morning. *Id.* This event also took place in front of the Speaker. *Id.*

According to the CP-534 Command Discipline Report, Moran's "conduct during these incidents [brought] discredit upon herself, impair[ed] efficiency, and discredit[ed] the reputation of the U.S. Capitol Police." *Id.* They also violated Operational Directive, PFR 1.3 Rules of Conduct, Category C: Detrimental Conduct, Rule C1: Conduct Unbecoming. Command Discipline Rep. According to the USCP Operational Directive, "conduct unbecoming" includes "that which brings the Department into disrepute or reflects discredit upon the employee as a member of the Department; that which impairs the operation or efficiency of the Department or the employee; and conduct which is prejudicial to the reputation and good order of the Department." USCP Operational Directive II at 5. A violation of Rule C1 subjects an employee to "an appropriate penalty" ranging from a warning to forfeiture of twenty-four hours of time/pay for each infraction. USCP Operational Directive I at 2.

Since the Court finds that the explanation the government proffered constitutes a legitimate reason for issuing the CP-534 and for assessing a forfeiture of sixteen hours of plaintiff's pay, the burden shifts back to plaintiff to show that it has produced evidence sufficient for a reasonable jury to find that these incidents were not the actual reason that the USCP issued the CP-534, and that the USCP actually retaliated against Moran. *Brady*, 520 F.3d at 495; *see*

*also Manuel v. Potter*, 685 F. Supp. 2d 46, 62 (D.D.C. 2010); *Musick v. Salazar*, 839 F. Supp. 2d 86, 95 (D.D.C. 2012).

### B.  Evidence of retaliation

In *Jones v. Bernanke*, the D.C. Circuit explained that once a defendant has shown a legitimate, non-retaliatory purpose for its actions, the dispositive inquiry is "whether the employee's evidence creates a material dispute on the ultimate issue of retaliation either directly by showing that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  557 F.3d at 678, citing *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983) (internal quotation marks and alterations omitted).   In other words, a court must determine whether there is "sufficient evidence for a reasonable jury to infer retaliation."  *Id.*

An employee can show a material dispute through a combination of "(1) [her] *prima facie* case; (2) any evidence [she] presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of [retaliation] that may be available to [her] . . . or contrary evidence that may be available to the employer."  *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998).

#### 1.  Whether Moran Engaged in a Protected Activity

We start first with defendant's argument that plaintiff's evidence is not sufficient for a reasonable jury to find retaliation because Moran did not engage in protected activity at all.[8]

---

[8]     Although defendant argues these points as part of the *prima facie* case, the Court construes it also as an argument that plaintiff ultimately cannot demonstrate an inference of actual retaliatory motive.  *Cf. Jones*, 557 F.3d at 679 ("[T]he reason we deem such evidence sufficient to support a *prima facie* case – that it tends to support a circumstantial inference of retaliation – applies to the ultimate inquiry as well.").

This requires the Court to interpret what constitutes protected activity under the CAA.  *Barnes v. Small*, 840 F.2d 972, 976 (D.C. Cir. 1988).

Moran points to three separate instances of protected activity.  Am. Compl. ¶¶ 119–21. Defendant does not dispute that the first – Moran's 2005 complaint to the OOC alleging discrimination in the manner that agents were assigned to the Speaker's detail – is protected activity under the CAA.  Mem. in Support of Def.'s Mot. for Summ. J. ("Def.'s Mem.") at 8–12; 2 U.S.C. § 1317.  Defendant does, however, challenge whether the second and third instances – Moran's August and November 2008 complaints to OPR – constitute protected activity.  *Id.*

An employee engages in protected activity under the opposition clause of the CAA if she has "opposed any practice made unlawful" by the CAA, such as sex discrimination.  2 U.S.C. § 1317(a).  According to defendant, the August 2008 complaint does not fall under the opposition clause because "[n]o reasonable person could have believed that the incidents recounted in the internal complaint on August 5, 2008, violated the CAA's retaliation standard." Def.'s Mem. at 11.

This Circuit has adopted a broad reading of the opposition clause, such that the opposed actions need not actually be unlawful under the CAA for the opposition activity to be protected. *George v. Leavitt*, 407 F.3d 405, 417 (D.C. Cir. 2005), quoting *Parker v. Balt. & Ohio R.R. Co.*, 652 F.2d 1012, 1020 (D.C. Cir. 1981) (alterations omitted).  Instead, "an employee seeking the protection of the opposition clause must demonstrate a good faith, reasonable belief that the challenged practice violates Title VII."  *Id.*

Defendant argues that the Supreme Court's decision in *Clark County School District v. Breeden*, 532 U.S. 268, 271 (2001), governs.  In *Breeden*, an employee complained about a sexually-charged comment her supervisor made when reviewing job applications.  *Id.* at 269.

13

The supervisor had read aloud a disclosure made on an application that the applicant had made a sexually explicit comment to a coworker.  *Id*.  After another employee expressed that he did not understand the reference, the supervisor responded, "Well, I'll tell you later," and they both laughed.  *Id.*  The plaintiff in that case claimed she was retaliated against for reporting this incident, but the Supreme Court held that "[n]o reasonable person could have believed that the single incident . . . violated Title VII's standard," so her reporting of the incident was not protected activity under the opposition clause.  *Id.* at 271.

However, in *Crawford v. Metropolitan Government*, 555 U.S. 271 (2009), the plaintiff alleged that the government had violated the opposition clause of Title VII's antiretaliation provision because upon questioning by a human resources officer, the plaintiff disclosed that she had experienced sexual harassment by one of her coworkers on multiple occasions.  *Id.* at 274. The Supreme Court referred to an EEOC guideline, which stated:  "When an employee communicates to her employer a belief that the employer engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's *opposition* to the activity."  *Id.* at 851 (internal quotation marks and citations omitted).

The Court finds the facts of the instant case more akin to *Crawford* than *Breeden.*  Unlike in *Breeden*, Moran's August 2008 complaint alleged several instances of sexual harassment. Def.'s Mem. at 11.  The complaint accused SSA Simons of making sexually-charged comments to and about female USCP officers on four occasions.  *See* Compl. Rep. (Aug. 5, 2008).  The four incidents are far more than a "single incident," both in terms of quantity and severity. Although Moran's complaints were not made to the USCP's EEO compliance branch, the same principle that the Supreme Court annunciated in *Crawford* applies here; when an employee

opposes an employer's action that she reasonably believes is discriminatory, the CAA protects the employee.

Defendant also argues that Moran's complaints should not be considered protected activity under the opposition clause because the allegedly harassing comments were not made to or about SA Moran. Rather the comments were about other agents, made to other agents, and then relayed to Moran through still other agents. Ex. 11 to Def.'s Mot. According to the USCP, since there was "no interference with her workplace whatsoever," Moran's complaints about sexual harassment experienced by others were not protected. Def.'s Mem. at 11. However, the express language of the CAA does not require the opposed action to be experienced or even witnessed by the complaining employee. The CAA protection applies when an individual has opposed "any practice made unlawful" by the CAA. 2 U.S.C. § 1317.

The Court is persuaded that plaintiff could have reasonably believed that the conduct she complained of in her August 2008 complaint constituted sex discrimination. But since the Court finds based on other grounds that no reasonable jury could infer retaliation from the evidence plaintiff has submitted, it can assume without deciding that the complaint constitutes protected activity under the CAA. The Court also assumes that Moran's November 2008 complaint to OPR constitutes protected activity under the CAA. In that complaint, she alleged that the USCP

had retaliated against her for her August complaint, which is prohibited under the opposition clause.  2 U.S.C. § 1317.[9]

Thus, the Court finds that Moran engaged in protected activity from August 2005 when Moran submitted her complaint to OCC until October 2007 when the OOC complaint settled; and assumes that she engaged in further protected activity when she filed her complaints with OPR on August 5 and November 7, 2008.[10]

> 2.  *Whether there is a causal connection between the protected activity and the adverse employment action*

Defendant next argues that plaintiff cannot meet her burden because the timing of the events does not support an inference of retaliatory motive.  Def.'s Mem. at 12–16.  "[T]he strength of the plaintiff's *prima facie* case, especially the existence of a causal connection, can be a significant factor" in showing a material dispute regarding retaliation.  *Holmes-Martin v.*

---

9        Defendant further contends that the August and November 2008 complaints do not fall under the participation clause because "[t]he Office of Professional Responsibility is not a part of any process under the CAA."  Def.'s Mem. at 9.  The Court agrees with this contention.

An employee engages in protected activity under the participation clause if she has "initiated proceedings, made a charge, or testified, assisted, or participated in any manner in a hearing or other proceedings under this chapter."  2 U.S.C. §1317.  The D.C. Circuit has interpreted Title VII's participation clause only to protect employees who are involved in formal complaints to the EEOC.  *See Parker*, 652 F.2d at 1019 (The participation clause in Title VII's anti-retaliation provision "speaks in clear, absolute terms, and has accordingly been interpreted as shielding recourse to the EEOC . . . ."); *Welzel v. Bernstein*, 436 F. Supp. 2d 110, 119 (D.D.C. 2006) (explaining that the participation clause only covers claims made to the EEOC).  Similarly, here, protection under the participation clause only extends to complaints made to the Office of Compliance, which is the body that receives and responds to employment claims under the CAA. *See* 2 U.S.C. § 1384.

Moran filed the August and November 2008 complaints with OPR, not with the OOC, so she is not protected by the participation clause.  However, her failure to demonstrate protected activity under the participation clause is insignificant because the Court assumes that her complaints constitute protected activity under the opposition clause.

10       The Court notes that there is no dispute that Moran has satisfied the "materially adverse action" element of the *prima facie* case.  The CP-534 that Moran received resulted in sixteen hours of lost pay.  *See* Command Discipline Rep. at 2; Def.'s Mem. at 12–13.  This constitutes the type of "direct economic harm" that constitutes "materially adverse action" in this Circuit. *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009).

*Sebelius*, 693 F. Supp. 2d 141, 152 (D.D.C. 2010), citing *Aka*, 156 F.3d at 1289 n.4 ("[A] *prima*

*facie* case that strongly suggests intentional discrimination may be enough by itself to survive

summary judgment.").  On the other hand, other courts in this district have suggested that a lack

of a causal connection shows that a plaintiff cannot establish pretext at the summary judgment

stage.  *Laurent v. Bureau of Rehab.*, 544 F. Supp. 2d 17, 23 n.5 (D.D.C. 2008) (finding that

employee was unable to establish pretext since she could not meet the *prima facie* timing

requirement between her protected activity and adverse employment action and therefore failed

to show a causal connection).

Defendant argues that the evidence does not support an inference that SSA Stonestreet

knew about Moran's complaints before he initiated his investigation for the CP-534, Def.'s

Reply in Support of Mot. for Summ. J. ("Def.'s Reply") at 8, or that Chief Morse knew about the

2008 complaints when he denied her appeal, *id.* at 9; Def.'s Mem. at 15–16.  Defendant also

argues that the investigation was initiated too far after the protected activity occurred for a

reasonable jury to find a retaliatory motive.  Def.'s Mem. at 13–15; Def.'s Reply at 7–9.

> In *Jones v. Bernanke*, the D.C. Circuit explained that a showing by plaintiff that
>
> the *employer* had knowledge of the employee's protected activity, and the adverse
> personnel action took place shortly after that activity – is adequate to permit an
> inference of retaliatory motive, at least at the prima facie stage.  Of course, that
> such evidence would show intent at the prima facie stage does not resolve the
> question of retaliation *vel non*. Yet the reason we deem such evidence sufficient to
> support a prima facie case – that it tends to support a circumstantial inference of
> retaliation – applies to the ultimate inquiry as well.

557 F.3d at 679 (internal quotation marks omitted).

A plaintiff can establish causal connection in making her *prima facie* case, "by showing

that the employer had knowledge of the employee's protected activity, and that the adverse

personnel action took place shortly after that activity."  *Mitchell v. Baldrige*, 759 F.2d 80, 86

(D.C. Cir. 1985). These requirements are known as the "knowledge" and "timing" requirements. *Timmons v. U.S. Capitol Police Bd.*, 407 F. Supp. 2d 8, 12 (D.D.C. 2005).

To fulfill the knowledge requirement, the official responsible for ordering the employee's adverse employment action must have known about the protected activity. *Laboy v. O'Neill*, No. 01-5322, 2002 WL 1050416, at *1 (D.C. Cir. Mar. 13, 2002), citing *Breeden*, 532 U.S. at 270–71; *see also Buggs v. Powell*, 293 F. Supp. 2d 150–51 (D.D.C. 2003) (finding that plaintiff was unable to establish the knowledge requirement because "the record indicate[d] that the selecting official was unaware of plaintiff's protected activity").

To prove the timing requirement, the Supreme Court has held that proximity between the protected activity and the adverse employment action must be "very close." *Breeden*, 532 U.S. at 273 (internal quotation marks omitted). Other courts in this district have found that "very close" means within three to four months. *See, e.g.*, *Allen v. Napolitano*, 774 F. Supp. 2d 186, 201 n.2 (D.D.C. 2011) ("In the D.C. Circuit, courts have held that alleged retaliatory acts must occur within three to four months of the protected activity to establish causation by temporal proximity."); *Gustave-Schmidt v. Chao*, 360 F. Supp. 2d 105, 118–19 (D.D.C. 2004) (explaining that an adverse action that occurred two days before the three-month mark after the protected activity "pushe[d] the temporal requirement . . . to its outer limit"). Further, in *Breeden*, the Supreme Court explained that "[a]ction taken . . . 20 months later suggests, by itself, no causality at all." 532 U.S. at 274.

Since different individuals in Moran's chain of command knew of each of the three instances of activity, and since they each occurred at different times, the Court will evaluate each claim independently.

i.      2005 complaint

There is no dispute that Chief Morse knew of Moran's sex discrimination complaint to OOC and subsequent 2007 settlement at some point before he denied Moran's appeal of the CP-534.  Morse Decl. ¶ 20.[11]  However, the gap between the 2005 complaint and the allegedly retaliatory action is much longer than the three to four months that courts have allowed for a *prima facie* showing of retaliation.  Nearly a year passed between the October 2007 settlement, and September 2008 when the investigation into Moran's conduct began.  Moreover, more than a year elapsed between the settlement and the recommendation of forfeited pay in November 2008.  This time period certainly does more than "push[] the temporal requirement . . . to its outer limit."  *Gustave-Schmidt*, 360 F. Supp. 2d at 118–19.  Accordingly, the timing of Moran's CP-534 and the 2005 sex discrimination complaint and subsequent settlement does not support an

---

11      Although Chief Morse did not initiate the investigation into the allegations of misconduct, he did ultimately deny plaintiff's appeal of the CP-534.  Ex. 4 to Def.'s Mot.

inference of retaliation.[12]  Moreover, it was not Chief Morse who prompted the investigation in the first place.

   ii.    August 2008 OPR complaint

   The record establishes that on August 14, 2008, SSA Stonestreet confronted Moran about her August 4 and 10 conduct, and that he initiated an investigation into those incidents on September 4, 2008.  Investigation Rep. at 3. There is some evidence in the record to suggest that SSA Stonestreet had learned of Moran's August 2008 complaint to OPR by the time he initiated the investigation:  Moran testified that when SSA Stonestreet admonished her on August 14,  she brought it up.  She states that on that date, she responded: "don't be piling all of this stuff up on top of me because of the complaint I filed against [the supervisor ]."  Moran Dep. at 77.  Further, in plaintiff's declaration, she asserted that Lt. Erickson, who signed off on Moran's complaint, also knew about the OPR complaint.  Moran Decl. ¶ 12.

   However,  SSA Stonestreet  testified that he did not learn of Moran's August 2008 OPR complaint  until  October  28,  when  he  interviewed  Moran  in  connection  with  the  ongoing

_____

12    Plaintiff argues that defendant offers no evidence to support the claim that Chief Morse became aware of the 2005 protected activity in 2007 and that he may not have become aware of the 2007 protected activity until some point during the course of the investigation into Moran's alleged misconduct.  *See* Pl.'s Opp. at 14. While the Court draws all inferences in favor of plaintiff at this point, it is plaintiff's burden to show a causal connection between the adverse action and the protected activity because plaintiff must proffer evidence from which a reasonable jury could infer an actual motive of retaliation.  *Jones*, 557 F.3d at 670.  Plaintiff may demonstrate this connection through circumstantial evidence.  *Id.*  Yet plaintiff here has failed to put forth evidence that Morse learned about the complaint during the course of the investigation into Moran's misconduct or at any point close in time to when he denied her appeal.  Therefore, the Court cannot find any evidence of temporal proximity that would create a genuine issue of material fact about whether retaliation was the actual motive for the issuance of the CP-534.
   Moreover, even if the Court assumes that Chief Morse only became aware of the 2005 complaint shortly before he denied Moran's appeal, there is no evidence that SSA Stonestreet knew about the 2005 complaint at the time he initiated the investigation or even issued the CP-534, or that Lt. Erickson knew about the complaint when he assessed a penalty of sixteen hours of pay forfeited.  So this evidence would not support an inference that the actual motive behind the CP-534 was retaliation for Moran's 2005 complaint.

investigation into her misconduct.  Stonestreet Dep., Ex. 7 to Def.'s Mot., at 24.  In short, there is a dispute of fact over whether the officers in Moran's chain of command knew of Moran's August 2008 complaint with OPR when they initiated and eventually signed off on the CP-534. However, there is no dispute that SSA Stonestreet did not know of the complaint when he first confronted Moran regarding the August 4 and August 10 incidents on August 14.

       iii.     November 2008 OPR complaint

Moran offers no evidence to show that anyone in her chain of command knew of her November 2008 retaliation allegations when she was issued the CP-534.  *See* Pl.'s Opp. at 9, 14– 15.  This weighs strongly against an inference that the CP-534 was issued in retaliation for the November 2008 complaint.

       iv.     Summary

In sum, plaintiff has not come forward with the evidence that would demonstrate the necessary causal connection between the three instances of protected activity and the actions taken against her.

The evidence of any causal connection between Moran's protected activity in August 2008 and the adverse employment action is, at best, weak.  There is conflicting evidence about whether SSA Stonestreet, who initiated the investigation into Moran's conduct, learned of the complaint on August 14, 2008 or on October 28, 2008.  Stonestreet Dep., Ex. 7 to Def.'s Mot. at 24.  But even if plaintiff's version was undisputed, her testimony establishes that SSA Stonestreet learned of the complaint to OPR only *after* he confronted Moran about her misconduct, and that it was Moran herself who put it on the table, in effect creating the record for her later retaliation claim.  Moran Dep. at 77.

Moran argues that "[t]he fact that [SSA] Stonestreet witnessed both [the August 4 and August 10] incidents and took no action at the time of the incidents, nor took any action when [they] spoke on August 14, 2008 shows there was no misconduct" by her.  Moran Decl. ¶ 6. However, plaintiff's understanding of what it means to "take action" is too narrow.  Stonestreet's efforts to discipline Moran began when he confronted her on August 14, even though he did not formally initiate the investigation at that point.  *See* Stonestreet Decl., Ex. 5 to Def.'s Mot. ¶ 4; Stonestreet Dep., Ex. 7 to Def.'s Mem., at 105.  After the confrontation, SSA Stonestreet left for a protective assignment, and his investigation began upon his return.  Investigation Rep. at 3.

As the Supreme Court has held, "[e]mployers need not suspend previously planned [actions] upon discovering [protected activity], and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Breeden*, 532 U.S. at 272.  SSA Stonestreet's investigation followed the USCP protocol for misconduct, and he was not required to suspend the investigation or alter its course just because Moran revealed her pending complaints in response to his reprimand.[13]  This principle also holds for Moran's November complaint – the investigation was well under way when Moran filed that retaliation complaint, and SSA Stonestreet was not required to cease his investigation because it was filed.

As for Moran's earlier protected activity, the 2005 complaint to OOC and later settlement, the causal connection falls well beyond the "outer limits" of the *prima facie* timing requirement. *Gustave-Schmidt*, 360 F. Supp. 2d at 118–19; *see also Laurent*, 544 F. Supp. 2d at 23 n.5.  And plaintiff has shown only that Chief Morse knew about that complaint.  Finally,

---

13      This is also true assuming that only the officers higher up in Moran's chain of command – but not Stonestreet himself – knew of Moran's protected activity.  Even if they knew of the protected activity, they did not need to order SSA Stonestreet to suspend his investigation because of protected activity of which he was unaware when the misconduct occurred.

plaintiff does not produce any evidence showing that any of the officials involved in the CP-534

process knew about the November 2008 complaint to OPR, so the causal connection there is also

lacking.

Overall, plaintiff's lack of evidence supporting a causal connection between the protected

activities and the issuance of adverse action demonstrate plaintiff's inability to establish pretext.

### C. Evidence to disprove the employer's non-retaliatory reasons for issuing the CP-534

Next, the Court looks to any evidence the employee presents to disprove the employer's

proffered explanation for its employment action.  *See Aka*, 156 F.3d at 1289.

As the D.C. Circuit explained in *Brady*, 520 F.3d at 495 (D.C. Cir. 2008), it is common at

this stage for an employee to

> attempt to demonstrate that the employer is making up or lying about the
> underlying facts that formed the predicate for the employment decision.  If the
> employer's stated belief about the underlying facts is reasonable in light of the
> evidence, however, there ordinarily is no basis for permitting a jury to conclude
> that the employer is lying about the underlying facts.

*Id.*

In *Brady*, the plaintiff had been demoted after allegedly "grab[bing] his crotch" in front

of three other employees.  *Id.* at 492.  The plaintiff sued, alleging that he was actually demoted

because of his race.  *Id.* at 491.  After the district court granted summary judgment in favor of the

employer, the plaintiff appealed, alleging there was a material dispute about whether the incident

for which he was demoted actually occurred, and claiming that it was a jury's responsibility to

determine that fact.  *Id.*  The circuit court upheld the district court's determination, explaining

that whether the incident happened is not the ultimate question, but whether "*the employer

honestly and reasonably believed* that the underlying sexual harassment incident occurred."  *Id.*

at 496.  If an employee could defeat summary judgment simply by denying the underlying

23

activity for which she was disciplined, the court reasoned, an employee could effectively get to trial in any case.  *Id.*  Instead, a plaintiff must provide *proof* that the employer is lying about its stated reasons for the adverse actions.  *See id.*; *see also McGrath v. Clinton*, 674 F. Supp. 2d 131, 145 (D.D.C. 2009) (plaintiff's only evidence that employer was lying about its stated reasons were "his own allegations," which was insufficient to prove retaliation).

Here, Moran's main defense is that the July 18, August 4, and August 10 incidents cited in the CP-534 did not occur in the way that the CP-534 and the attached investigation report described.  Specifically, regarding the July 18 incident with Detective Atkinson that was described as an "altercation" in the CP-534, Moran stated in her deposition that their conversation was not an argument or confrontation.  Moran Dep. at 128; *see also* Mem. of Appeal at 3.  Moran further argues that the July 18 incident with SA MacDougall did not embarrass him.  Mem. of Appeal at 4.  Instead, when they both answered their supervisor at the same time with conflicting drive times for the following morning, Moran claims that she stated, "Go with Sean's time."  *Id.*  Regarding the August 4 protection formation incident, Moran stated that Stonestreet later told her that she had done the right thing.  *Id.* at 3–4.  Finally, Moran claimed in her appeal of the CP-534 that she "never said a word during" the exchange about the drive time in the Speaker's presence.  *Id.* at 4.  Plaintiff's self-serving explanations do no nothing more than deny the facts of the underlying events, and this alone is not enough to disprove defendant's stated legitimate, non-retaliatory grounds for its actions.  Given that USCP's stated belief about the underlying facts is reasonable in light of the evidence, there is "no basis for permitting a jury to conclude that it is lying about the underlying facts."  *Brady*, 520 F.3d at 495.

Moran also claims that she had never received any disciplinary action until after she engaged in protected activity.  Moran Decl. ¶ 2.  But even if the Court takes that statement as

true, it is irrelevant to the inquiry of whether Moran acted improperly during these reported incidents; her former conduct has no bearing on the conduct at issue in this case.

Finally, Moran claims that statements that SA Thomas makes in his declaration create a dispute of material fact. Pl.'s Opp. at 16.  The declaration states that SA Thompson "witnessed [several agents, including SSA Stonestreet] conspiring to get Special Agent Moran kicked off the team.  They did this by meeting in various combinations with each other and talking about different incidents involving Special Agent Luanne Moran which they thought they could use to build a case against her."  Thompson Decl., Ex. 2 to Pl.'s Opp. ¶ 4.  However, even if it is true that the agents worked together to have Moran removed from the team, the declaration does not indicate that their motive was retaliation for her protected activity.  Furthermore, this statement does not contradict the allegations of misconduct that defendant has put forth as legitimate reasons for issuing the CP-534.  Therefore, SA Thomas's declaration does not provide a sufficient basis for a reasonable jury to infer retaliation.  *See Jones*, 557 F.3d at 678.

In sum, plaintiff has failed to produce evidence sufficient for a reasonable jury to find a retaliatory motive for the issuance of the CP-534.

## IV.    CONCLUSION

Because defendant has raised a legitimate non-retaliatory motive for issuing the CP-534 to Moran and docking sixteen hours of her pay, and plaintiff has failed to produce evidence that would raise a dispute of material fact as to that motive, the Court will grant USCP's motion for summary judgment.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  August 20, 2012